IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| Mathew Bray,<br><br>        Plaintiff,<br><br>v.<br><br>Union Pacific Railroad Co.,<br><br>        Defendant. | Case No. 8:23-cv-235<br><br>**COMPLAINT**<br>**JURY TRIAL DEMANDED** |

Plaintiff Mathew Bray ("Bray") files this Complaint against Defendant Union Pacific Railroad Co. ("Union Pacific" or "Defendant") for damages resulting from its violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, as amended ("ADA").

**PRELIMINARY STATEMENT**

1. Beginning in 2014, Union Pacific implemented company-wide changes to its fitness-for-duty program ("Fitness-for-Duty"). As a result of these changes, Union Pacific imposed a blanket requirement that employees in certain positions disclose specified health conditions—even when the condition had no impact on the employee's ability to safely perform his or her job. This requirement was needlessly invasive and violated the ADA by itself, but Union Pacific made matters worse by imposing a policy that automatically removes employees who disclose health conditions, or who Union Pacific suspects may have health conditions, from service. Union Pacific then subjects the employee to a Fitness-for-Duty evaluation, again regardless of whether the employee has been safely performing the essential functions of his or her job. These evaluations do not assess whether an employee is capable of performing the essential functions of his or her

position, and Union Pacific does not conduct physical examinations of employees. Furthermore, Union Pacific routinely disregards the opinions of outside doctors who do conduct physical evaluations of the employees. Instead, Union Pacific demands medical information from the employee and conducts a "file review," regularly and arbitrarily concluding that the employee is unfit for duty because of a disability, and issuing unnecessary work restrictions it then refuses to accommodate.

2. In February 2016, several Union Pacific employees commenced a class-action disability discrimination lawsuit against Union Pacific, alleging that Union Pacific's Fitness-for-Duty policies and practices constituted a pattern or practice of discrimination under the ADA. *See Quinton Harris et al. v. Union Pacific Railroad Co.*, Case No. 8:16-cv-381 (D. Neb.). The District of Nebraska certified the class in February 2019; however, the Eighth Circuit Court of Appeals reversed the certification decision in March 2020.

3. Bray is a victim of the same discriminatory Fitness-for-Duty policies and practices alleged in *Harris*. Despite being qualified and safely performing his job without incident, Bray was removed from service for a Fitness-for-Duty evaluation under the new program and excluded from work at Union Pacific because of a disability. Bray was a class member in *Harris*, and now timely brings this individual legal action.

## JURISDICTION AND VENUE

4. This Court has jurisdiction under 28 U.S.C. § 1331 because Union Pacific violated the ADA.

5. Venue is proper under 28 U.S.C. § 1391(b)(1) because Defendant is headquartered in Omaha, Nebraska.

6. Venue is proper under 42 U.S.C. § 2000e-5(f)(3) because unlawful employment practices were committed by Union Pacific in Omaha, Nebraska, because employment records relevant to Defendant's unlawful employment practices are maintained and administered in Omaha, Nebraska, and because Union Pacific's principal office is in Omaha, Nebraska.

## THE PARTIES

7. Bray resides in Walla Walla, Washington. He was an employee of Union Pacific working in La Grande, Oregon.

8. Union Pacific is a railroad carrier engaged in interstate commerce and has operations in LaGrande, Oregon and is headquartered in Omaha, Nebraska.

## FACTUAL ALLEGATIONS

### *UNION PACIFIC'S FITNESS-FOR-DUTY POLICIES AND PRACTICES*

9. Union Pacific's Medical Rules, as reviewed and revised on February 1, 2014 (attached as Exhibit A), apply to all Union Pacific employees across the country. They outline the Fitness-for-Duty program at Union Pacific.

10. The Medical Rules require, among other things, that all employees in Telecom positions, Supply Department field positions, Operating Department field positions (including Transportation, Engineering Services and Mechanical positions), and Dispatcher positions disclose "any new diagnosis, recent events, and/or change in the following conditions"—which Union Pacific labels "Reportable Health Events." (Exhibit A.) This includes, but is not limited to, eye surgeries for glaucoma, cataracts, or laser treatment of the cornea and/or retina.

11. Union Pacific's Fitness-for-Duty and "Reportable Health Events" policies are even broader in practice than the Medical Rules reflect. Union Pacific routinely triggers the Fitness-for-Duty process for employees who have never indicated they are unable to perform the essential functions of their jobs, simply because Union Pacific learns or suspects that the employee has, or has had in the past, a listed or non-listed health condition, or because a manager refers the employee for a Fitness-for-Duty evaluation based on a belief that an employee may have such a health condition.

12. Union Pacific also maintains other unlawful policies and qualification standards related to Fitness-for Duty that are not included within the Medical Rules. For example, Union Pacific uses a "1% rule" that disqualifies from service any employee who Union Pacific suspects or believes may be at more than a 1% risk of sudden incapacitation. Union Pacific also requires employees to undergo exercise tolerance testing and then disqualifies from service any employee whose test results are not "normal," based on an indication that the employee may have a cardiac condition, however minor. On information and belief, Union Pacific maintains other, similar policies that it uses to screen out employees with disabilities for failing to meet a discriminatory qualification standard.

13. When a Fitness-for-Duty evaluation is triggered, the employee must:

**Stay off work** (not to report to work or mark up for work) until Health and Medical
Services has completed a Fitness-for-Duty evaluation for that particular health event and has provided the employee's Supervisor with notification that the employee is fit for duty and able to return to his/her job.

**Notify his/her Supervisor** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty determination prior to the employee being able to work.

4

> **Notify Health and Medical Services** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty evaluation.

(Exhibit A.)

14. These Fitness-for-Duty evaluations are not individualized assessments of the employee's ability to safely perform the essential functions of the employee's job.

15. Union Pacific does not directly examine employees during Fitness-For-Duty evaluations.

16. Union Pacific routinely disregards the opinions of the employee's treating medical provider(s), and other medical providers who have physically examined the employee, and instead makes broad requests for medical information, including medical records, from the employee.

17. Once Union Pacific receives the medical information, Union Pacific's Health and Medical Services Department ("Health and Medical Services"), located in Omaha, Nebraska, conducts a "file review" and issues a Fitness-for-Duty determination that the employee is either fit for duty, fit for duty with restrictions, or unfit for duty.

18. Health and Medical Services routinely issues Fitness-for-Duty decisions that disqualify employees from their positions because of a disability, even though the disability does not affect the employee's ability to safely perform the essential functions of the employee's job (or other positions for which the employee may also be qualified).

19. Health and Medical Services also uses discriminatory qualification standards, tests, and/or other selection criteria to exclude individuals with disabilities from their positions.

20. When issuing Fitness-for-Duty determinations, Health and Medical Services relies on standardized protocols for employees with certain broad categories of health conditions or treatments, and it assigns standardized work restrictions to employees.

21. For example, as part of these standardized protocols, Health and Medical Services regularly relied on the Federal Motor Carrier Safety Administration ("FMCSA") 2014 Medical Examiner's Handbook ("2014 Medical Examiner's Handbook"), which the company downloaded from the FMCSA website, to determine which health conditions required work restrictions, which standard restrictions to impose, and how long those restrictions should remain in place.

22. Union Pacific's then-Chief Medical Officer Doctor John Holland described the 2014 Medical Examiner's Handbook as "one of the sources we think is the best."

23. The recommendations contained in the 2014 Medical Examiner's Handbook, however, did not apply to railroad workers, but instead provided non-binding guidance to FMCSA medical examiners intended for use in medical certification of drivers operating a commercial vehicle in interstate commerce.

24. In addition, by December 2014, the FMCSA withdrew the 2014 Medical Examiner's Handbook from its website and no longer endorsed it for use for commercial driver certifications. Upon information and belief, the FMCSA never again endorsed the 2014 Medical Examiner's Handbook once it was removed from the website.

25. By at least 2015, Dr. Holland and Union Pacific learned that the FMCSA removed the Handbook from its website and no longer endorsed its use.

26. Despite this, Union Pacific continued to rely on the outdated Handbook as a basis to assign standardized work restrictions for its employees, including workers who are not subject to FMCSA medical certification requirements.

27. Union Pacific also represented to Courts, including in the *Harris* action, that the 2014 Medical Examiner's Handbook was reliable guidance and supported its decisions to impose standardized work restrictions for its employees. For example:

   a. "Union Pacific concluded that the 1% level of acceptable risk for sudden incapacitation is consistent with the acceptable risk threshold recommended by the FMCSA Medical Review Board and the 2014 version of the online FMCSA Medical Examiner Handbook[.]" Def.'s Br. in Opp'n to Pl.'s Mot. for Class Certification at 21, *Harris et al. v. Union Pacific Railroad Co.*, 8:16-cv-00381-JFB-SMB, ECF No. 259 (internal quotations omitted).

   b. "In 2014 the FMCSA issued Medical Examiner Handbook (FMCSA 2014) to provide medical examiners guidance for making medical fitness-for-duty recommendations for multiple health conditions that can impair the safety for commercial vehicle drivers. These and other recent FMCSA guidance documents, have served [] as reference materials and a general model for developing the Medical Fitness-for-duty Guidelines presented here." Dr. Holland Rebuttal Expert Report, May 11, 2018, *Harris et al. v. Union Pacific Railroad Co.*, 8:16-cv-00381-JFB-SMB, ECF No. 249-16.

   c. "Since 2014, Union Pacific has relied on the FMCSA's guidelines, as reflected in its Medical Examiner Handbook, in determining whether employees with epilepsy, a single unprovoked seizure, or other seizure risks who work in safety sensitive positions have an unacceptably high seizure risk such that it is appropriate to impose work restrictions." Decl. of Dr. John Holland dated Oct. 2, 2018 at 6, *Harris et al. v. Union Pacific Railroad Co.*, 8:16-cv-00381-JFB-SMB, ECF No. 261-71.

28. Through its Fitness-For-Duty program, Union Pacific removes employees from service based on medical conditions it learns or believes an employee may have or may have had in the past, whether or not such conditions actually interfere with the employee's ability to perform the essential functions of their position, and without making a good-faith effort to determine whether a reasonable accommodation exists.

29. As a result of the conduct described above, Union Pacific employees who have never had a problem performing the essential functions of their jobs have been forced to disclose sensitive medical information, stay off work without pay, and many have lost their livelihoods.

### *PLAINTIFF MATHEW BRAY*

30. Bray was hired by Union Pacific on January 5, 1998, as a switchman. He then became a brakeman and conductor before becoming a locomotive engineer.

31. Most recently, Bray worked for Union Pacific as a locomotive engineer in La Grande, Oregon, and as a conductor in other locations. Over his 18-year career with Union Pacific, he worked ably and safely in and around trains.

32. For many years, Bray lived and worked with an eye condition, pigmentary glaucoma, without incident. Bray's pigmentary glaucoma is controlled with medication.

33. On or about July 21, 2016, Bray had surgery on his right eye to help relieve pressure in his eye caused by pigmentary glaucoma. He chose to have the surgery to help maintain his longevity in working for Union Pacific.

34. After Bray's medical leave for his eye surgery and related recovery, Union Pacific would not allow him to return to work without first submitting medical records for a Fitness-for-Duty evaluation, which he timely submitted.

35. Bray's treating ophthalmologist, Dr. Hanna Takasawga, M.D., cleared Bray to return to work with no restrictions on September 22, 2016.

36. Despite this clearance, on October 17, 2016, Union Pacific's then-Chief Medical Officer, Dr. John Holland, placed permanent work restrictions on Bray that prohibited him from returning to work as either a locomotive engineer or conductor.

37. The permanent work restrictions Union Pacific imposed on Bray include: (1) Does not meet Federal Railroad Administration (FRA) medical standards as a locomotive engineer or conductor; (2) Not to do jobs that require the accurate identification of colored wayside railroad signal lights; and (3) If a new job assignment is considered, then Health and Medical Services should review the functional job demands to determine if the employee can safely perform the essential functions of the job.

38. At no time during the Fitness-for-Duty process, or after, did Dr. Holland or any doctor affiliated with Union Pacific physically examine Bray.

39. Upon information and belief, at no time during or after this process did Dr. Holland or any doctor affiliated with Union Pacific speak with any of Bray's treating doctors, including Dr. Takasawga, who had cleared Bray to return to work.

40. As a result of the onerous restrictions Union Pacific imposed, Bray concluded it would be futile to continue to seek accommodations from Union Pacific to return to his position or to any other position with the Railroad.

41. In the time since it imposed permanent work restrictions on Bray, Union Pacific has persisted in its refusal to allow Bray to return to his job or to another position.

42. Following his employment with Union Pacific, Bray has worked several jobs, including as a laborer at Crown Paper and Janitorial Supply Company. He also applied for and receives Railroad Retirement Board ("RRB") benefits in order to make ends meet. Bray earns substantially less than he did when he worked for Union Pacific.

43. Bray remains capable of working in his former positions to this day.

44. On February 19, 2016, counsel for Bray, on behalf of six named plaintiffs and those similarly situated, filed a First Amended Complaint against Union Pacific in the

Western District of Washington, alleging disability discrimination in violation of the ADA, along with state law. The case was thereafter transferred to the District of Nebraska. *See Harris v. Union Pac. R.R. Co.*, Case No. 8:16-cv-381 (D. Neb.).

45. Because he was a class member in *Harris*, Bray's disability discrimination claims have been tolled during the pendency of the class action, pursuant to the Supreme Court's ruling in *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345 (1983).

46. This Court certified the class action in February 2019; however, the Eighth Circuit Court of Appeals reversed the certification decision on March 24, 2020.

47. As a result of *Crown, Cork* tolling, Bray had three hundred (300) days from the date of the Eighth Circuit's order to file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Shortly after the Eighth Circuit issued its order reversing class certification, the parties entered into a tolling agreement, extending the statute of limitations for Bray's and other class members' claims by an additional sixty (60) days. Bray timely filed a charge of discrimination with the EEOC, on April 10, 2020. On May 25, 2023, the EEOC issued Bray a right-to-sue letter. Bray now timely initiates the present lawsuit.

## CAUSES OF ACTION

### COUNT I

*VIOLATIONS OF THE ADA, 42 U.S.C. § 12112(a)*
*DISABILITY DISCRIMINATION—DISPARATE TREATMENT*

48. Bray incorporates the foregoing paragraphs by reference.

49. The ADA defines a disability as (A) a physical or mental impairment that impairs one or more major life activities; (B) a record of such impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1).

50. At all relevant times, Bray was an individual with a disability as defined by the ADA.

51. At all relevant times, Bray had the requisite skill, experience, education, and other job-related requirements of his position, could perform the essential functions of his position with or without reasonable accommodations, and was therefore a qualified individual under the ADA.

52. Section 12112(a) of the ADA prohibits employers from discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

53. Union Pacific discriminated against Bray on the basis of disability by, among other things, imposing permanent work restrictions on him disqualifying him from his position and others for which he was qualified.

54. Because Union Pacific violated 42 U.S.C. § 12112, Bray has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Bray is also entitled to attorneys' fees and costs incurred in connection with these claims.

55. Union Pacific committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Bray and others similarly situated. As a result, Bray is entitled to punitive damages.

## COUNT II

*VIOLATIONS OF THE ADA, 42 U.S.C. § 12112(b)(6)*
*DISABILITY DISCRIMINATION—DISPARATE TREATMENT*

56. Bray incorporates the foregoing paragraphs by reference.

57. "'[D]iscriminat[ing] against a qualified individual on the basis of disability' includes . . . using qualification standards, employment tests or other selection criteria that screen out . . . an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria . . . is shown to be job-related for the position in question and is consistent with business necessity[.]" 42 U.S.C. § 12112(b)(6).

58. Union Pacific discriminated against Bray on the basis of disability by using facially discriminatory qualification standards, employment tests, and/or other selection criteria, as part of its Fitness-For-Duty program and related policies, that are intended to screen out individuals with disabilities, and which did screen out Bray.

59. Union Pacific's qualification standards are neither job-related nor consistent with business necessity.

60. Because Union Pacific violated 42 U.S.C. § 12112, Bray has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Bray is also entitled to attorneys' fees and costs incurred in connection with these claims.

61. Union Pacific committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Bray and others similarly situated. As a result, Bray is entitled to punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE, Bray prays for judgment against Union Pacific as follows:**

1. That the practices of Union Pacific complained of herein be determined and adjudged to constitute violations of the ADA;

2. An injunction against Union Pacific and its directors, officers, owners, agents, successors, employees and representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

3. For an award of damages arising from loss of past and future income, emotional distress, and other compensatory damages in excess of $75,000.00;

4. Pre-judgment interest, as provided by law;

5. For Bray's costs, disbursements, and attorneys' fees pursuant to law;

6. For an award of punitive damages;

7. For all relief available under the ADA;

8. For such other and further relief available by statute; and

9. For such other and further relief as the Court deems just and equitable.

Date: June 1, 2023

**NICHOLS KASTER, PLLP**

s/Jacob C. Harksen
James H. Kaster* (MN # 53946)
    kaster@nka.com
Lucas J. Kaster* (MN # 396251)
    lkaster@nka.com
Jacob C. Harksen* (MN # 0400097)
    jharksen@nka.com
80 South Eighth Street
4700 IDS Center
Minneapolis, Minnesota 55402-2242
Telephone: (612) 256-3200
Fax: (612) 338-4878

*Admitted in D. Neb.

**ATTORNEYS FOR PLAINTIFF**